UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RAFFI BARSOUMIAN, M.D.,

                                        Plaintiff,

-v-

ANN C. WILLIAMS, ESQ.                                    **COMPLAINT**
Individually and as Associate Counsel
State University of New York at Buffalo

UNIVERSITY MEDICAL RESIDENT
SERVICES, P.C.,

JAMES M. HASSETT, M.D.
Individually and as Program Director
of the Department of Surgery

ROSEANNE C. BERGER, M.D.
Individually and as Senior Associate
Dean of Graduate Medical Education

GREGORY CHERR, M.D.
Individually and as Program Director
of the Department of Surgery

SUSAN ORRANGE, Ed. M
Individually and as Director of Education
& Resident Support Services

KEVIN GIBBONS, M.D.
Individually and as Step Two Grievance
Hearing Committee Chairman

S.U.N.Y AT BUFFALO
School of Medicine and Biomedical Sciences
                                        Defendants.
_____

The Plaintiff, Raffi Barsoumian, MD, by his attorneys, CHIACCHIA & FLEMING, LLP, Andrew P. Fleming, Esq., of Counsel, as and for his Complaint against Defendants, hereby alleges:

1.      Dr. Barsoumian is seeking a judgment against the Defendants, as hereinafter described, hold them liable for: a) deprivation of his rights under 42 U.S.C. § 1983, et seq., for Fourteenth Amendment procedural and substantive due process violations; (b) breach of contract; (c) fraud; and, (d) tortious interference with contractual relations.  Dr. Barsoumian seeks compensatory and punitive damages, preliminary injunctive relief, equitable relief, and specific performance of his contract, name clearing hearings and such other relief as this court may deem just and proper.

2.      At all times hereinafter mentioned, Dr. Barsoumian RAFFI BARSOUMIAN, MD (hereinafter referred to as "BARSOUMIAN" or "Dr. Barsoumian") was a resident of New York State in the Western District of New York.

3.      Upon information and belief, at all times hereinafter mentioned, Defendant ANN C. WILLIAMS, ESQ, (hereinafter referred to as "WILLIAMS") was a resident of the County of Erie and State of New York.

4.      WILLIAMS was, at all times mentioned herein, employed at the University of Buffalo (the "University") as Associate Counsel and she is sued in both her individual and official capacity.  At all times mentioned herein, Williams was acting under the color of state law.

5.      Upon information and belief, at all times hereinafter mentioned, Defendant UNIVERSITY MEDICAL RESIDENT SERVICES, P.C. (hereinafter referred to as "UMRS")

was and continues to be a professional corporation organized and existing pursuant to the laws of the State of New York with offices in Erie County.

6.     Upon information and belief, at all times hereinafter mentioned, Defendant JAMES M. HASSETT, (hereinafter referred to as "HASSETT") was a resident of the County of Erie and State of New York.

7.     HASSETT was, at all times mentioned herein, employed at the UNIVERSITY as Program Director of the Department of Surgery and he is sued in both his individual and official capacity.  At all times mentioned herein, HASSETT was acting under the color of state law.

8.     Upon information and belief, at all times hereinafter mentioned, Defendant ROSEANNE C. BERGER, MD (hereinafter referred to as "BERGER") was a resident of the County of Erie and State of New York.

9.     BERGER was, at all times mentioned herein, employed at the UNIVERSITY as Senior Associate Dean of Graduate Medical Education and she is sued in both her individual and official capacity.  At all times mentioned herein, ROSEANNE C. BERGER, MD was acting under the color of state law.

10.     Upon information and belief, at all times hereinafter mentioned, Defendant GREGORY CHERR, MD (hereinafter referred to as "CHERR") was a resident of the County of Erie and State of New York.

11.     CHERR was, at all times mentioned herein, employed at the UNIVERSITY as Program Director of the Department of Surgery and he is sued in both his individual and official capacity.  At all times mentioned herein, GREGORY CHERR, MD was acting under the color of state law.

12.     Upon information and belief, at all times hereinafter mentioned, Defendant SUSAN ORRANGE, ED. M. (hereinafter referred to as "ORRANGE") was a resident of the County of Erie and State of New York.

13.     ORRANGE was, at all times mentioned herein, employed at the UNIVERSITY as Director of Education & Resident Support Services in the Office of Graduate Medical Education and she is sued in both her individual and official capacity.  At all times mentioned herein, ORRANGE was acting under the color of state law.

14.     Upon information and belief, at all times hereinafter mentioned, Defendant KEVIN GIBBONS, M.D. (hereinafter referred to as "GIBBONS") was a resident of the County of Erie and State of New York.

15     GIBBONS was, at all times mentioned herein, employed at the UNIVERSITY as Program Director of the Department of Neurosurgery and was appointed by the UNIVERSITY to serve and did serve as Step Two Grievance Hearing Committee Chairman and he is sued in both his individual and official capacity.  At all times mentioned herein, KEVIN GIBBONS, MD was acting under the color of state law.

16.     Upon information and belief, at all times hereinafter mentioned, Defendant, S.U.N.Y. AT BUFFALO SCHOOL OF MEDICINE AND BIOMEDICAL SCIENCES (hereinafter referred to as "UNIVERSITY') was and continues to be a chartered collegiate institution organized and existing by virtue of the laws of the State of New York.  [Hereinafter, any references to a "Defendant" shall include said Defendant's agents, employees and/or representatives.]

**JURISDICTION**

17.     Jurisdiction of this Court is invoked pursuant to 28 USC section 1331 and the Court has supplemental jurisdiction to adjudicate Dr. Barsoumian's state law claims under state law pursuant to 28 USC section 1367.

18.     Venue is proper pursuant to 28 USC section 1391.

**FACTS**

19.     On March 19, 2012 (Case 1:06-cv-00831) the Honorable Judge William M. Skretny found Defendants HASSETT and BERGER, acting in their official capacities, to have violated Dr. Barsoumian's right to procedural due process.

20.     In addition, this Court found that UMRS breached Dr. Barsoumian's Residency Employment Agreement ("REA") and granted Dr. Barsoumian partial summary judgment with respect to UMRS' liability for breach of contract.

21.     Accordingly, this Court Ordered defendants Hassett, Berger, and UMRS to reinstate Dr. Barsoumian as a PGY3 resident on probation.

22.     Furthermore, in its 19 March 2012 Decision and Order this Court found that "[t]he grievance process has not yet concluded with respect to Kaleida Health's determination that [Dr. Barsoumian] violated the sexual harassment policy…"

23.     In its 19 March 2012 Decision this Court granted Dr. Barsoumian equitable relief limited to reinstatement as a PGY3 resident on probation finding that was relief that Dr. Barsoumian was otherwise entitled to in 2005, but which Defendants unlawfully deprived him for seven years.

24.     The Court's 19 March 2012 order to reinstate Dr. Barsoumian as a PGY3 resident on probation was clear and unequivocal.

25.     Defendants disobeyed the Court's Order by <u>not reinstating</u> Dr. Barsoumian to the PGY3 categorical residency position which he had previously occupied prior to his wrongful removal from the residency program.

26.     Defendants acting in their individual and official capacities, joint and severally, deprived Dr. Barsoumian of the rights that this Court Ordered to be restored.

27.     Beginning from the time this Court ordered Dr. Barsoumian to be reinstated, UMRS has repeatedly failed to abide by and meet its contractual obligations to Dr. Barsoumian.

28.     Dr. Barsoumian entered into a Residency Employment Agreement ("REA") with UMRS in 2012 which Dr. Barsoumian signed on June 4, 2012.  [A copy of the REA is attached hereto and made a part hereof, (as are all exhibits hereto,) as Exhibit "A".]

29.     Paragraph 8 of the REA addresses "Termination of Employment": *"The employment and professional relationship provided for in this Agreement may be terminated at any time by (i) the Program Director with the written concurrence of the Employer, or (ii) by the Employer with the written concurrence of the Program Director, <u>each of which is subject to the UB GME Grievance Procedures Policy."</u>*  (Exhibit "A".) (Emphasis added.)

30.     Dr. Barsoumian's REA was subject to the UB GME Grievance Policy and Procedure (2012) (hereinafter "UB GME GPP").

31.     Dr. Barsoumian's employment could only be terminated in accordance with the terms of UB GME GPP.

32.     The UB GME GPP (2012) is the sole policy and procedure which the University makes available to UB residents to review an adverse action which threatens their continued participation in a UB residency program.  (A copy of the UB GME Grievance Policy and Procedure is attached as Exhibit "B".)

33.     The UB GME GPP describes *"The Grievance Process"* as a three step process which entitles a UB resident to a *"Step One: Discussion"*, a *"Step Two: Grievance Hearing"* and, in certain circumstances, a *"Step Three: Appeal."*

34.     The UB GME GPP policies and procedures have remained unchanged and in effect since April, 2012.

35.     On December 28, 2012, Dr. Barsoumian's program director, CHERR, engaged Dr. Barsoumian in a "Step One Discussion"

36.     CHERR informed Dr. Barsoumian that he was being dismissed from the residency program because Dr. Barsoumian purportedly remained unable to meet the terms of the court-ordered probation and because Dr. Barsoumian purportedly lacked insight that his *"...alleged violations of the sexual harassment policies at Kaleida Health constituted unprofessional behavior."*

37.     Dr. Barsoumian told CHERR that he objected to the dismissal decision. However, a resolution was not reached through the Step One Discussion, resulting in Plaintiff being dismissed from the UB General Surgery Residency Program on December 28, 2012.

38.     Dr. Barsoumian timely sought a Step Two Grievance Hearing to challenge CHERR's December 28, 2012 dismissal action.

39.     Under the UB GME GPP, a Step Two Grievance Hearing is the hearing through which CHERR's dismissal action of Dr. Barsoumian is reviewed by a five member Step Two Grievance Committee (hereinafter "Step Two Committee").

40.  The UB GME GPP are the rules and procedures which Defendants and the Step Two Committee must follow.

41.     UB GME GPP describes the required *"Conduct of the Step Two Grievance Hearing"* through four sections which address *"Attendance"*, *"Proceedings"*, *"Recesses and Adjournments"* and *"Decisions."*

I.      **DEFENDANTS EFFECTUATED DR. BARSOUMIAN'S DISMISSAL IN 2012 BY DEVIATING FROM THEIR GRIEVANCE PROCEDURES THEREBY RENDERING THE GRIEVANCE PROCESS MEANINGLESS, AS WELL AS DEPRIVING HIM OF THEIR CONTRACTUAL PROMISE AS IT PERTAINED TO THE TERMINATION OF HIS EMPLOYMENT**

        (i)     **Dr. Barsoumian and CHERR are notified of the Pre-Hearing Requirements for the September 19, 2013 Step Two Grievance Hearing**

42.     On August 28, 2013, Dr. Barsoumian was informed by ORRANGE that the Step Two Grievance Hearing was scheduled for September 19, 2013. (A copy of the letter containing the notification is attached as Exhibit "C".)

43.     In her August 28, 2013 letter to the parties, ORRANGE identified that Dr. Kevin Gibbons (GIBBONS) was appointed to serve as the Chairman of the Step Two Committee.

44.     Also in her August 28, 2013 letter to the parties, ORRANGE set the deadline required by UB GME GPP to submit witness lists and written statements and documentation as 5pm, September 12, 2013:

> *"Please provide me with a list of any witnesses (name & role) who will testify on your behalf, as well as any written statements or documentation to support your position by 5:00 pm on Thursday, September 12, 2013 – five (5) days prior to the Step Two Grievance Hearing as required by the UB Graduate Medical Education Grievance Policy & Procedure ."* (Emphasis added).

45.     The UB GME GPP provides that "Either party may submit written statements and other documentation in support of their position. Copies of these materials will be shared with the Grievance Hearing committee and the other party involved. All written materials must be

received by the GME Office no later than five (5) working days before the Grievance Hearing, so that copies can be forwarded to the parties and the Grievance Hearing Committee members for review prior to commencement of the Grievance Hearing."

46.     The UB GME GPP specifies provides that "Each party has the right to call and examine witnesses and cross-examine any witness, including representatives from the program. Witness lists must be submitted no later than five (5) working days before the Grievance Hearing."

47.     CHERR did not identify any witnesses to call at the Step Two Grievance Hearing.

48.     Dr. Barsoumian identified Dr. John Gibbs, as a witness he intended to call to testify on his behalf at the Step Two Grievance Hearing.  Thus, Dr. Barsoumian and Dr. Gibbs testified on Dr. Barsoumian's behalf. (Dr. John Gibbs was the only witness identified by either of the parties to offer witness testimony at the Step Two Grievance Hearing scheduled for September 19, 2013.)

49.     ORRANGE wrote on September 18, 2013 to CHERR and Dr. Barsoumian:

*"I am writing to communicate the witness lists that were shared with me on Thursday.  The department will not be calling any witnesses.  The resident will be calling Dr. John Gibbs."*

(A copy of ORRANGE's email is attached as Exhibit "D".)


### (ii)     The Step Two Grievance Hearing:  September 19, 2013

50.     The Step Two Grievance Hearing convened on September 19, 2013.  (A copy of the Report of the Step Two Grievance Hearing Committee, hereinafter "Report", is attached as Exhibit "E".)

51.     ORRANGE, CHERR and Dr. Barsoumian joined the Step Two Committee at or about 1:20 pm "(13:20)." (See, Exhibit "E".)

52.     ORRANGE then instructed the Committee to answer the following two questions: *"Was the decision to terminate Dr. Barsoumian for failing to meet the criteria for removal from probation supported by the evidence contained in the file and testimony of witnesses (both written and oral)?"*, and *"Was the decision to terminate Dr. Barsoumian consistent with the policies of the UBGMDE?"*   (A copy of the instruction given to the Step Two Committee by ORRANGE is attached as Exhibit "F".)

53.     ORRANGE instructed the Step Two Committee Chairman as follows:   *"Dr. **Kevin Gibbons, who is the Chair of the Grievance Committee**, will preside over the Step Two Grievance Hearing, and **will determine the procedure and conduct of the Hearing in accordance with the Grievance Policy and Procedure for a Step Two Grievance Hearing**, attached."* (See, Exhibit "F".) (Emphasis added).

54.     Oral presentations at the Step Two Grievance Hearing commenced at 1:26pm *"(13:26)."* (See, Exhibit "E".)

55.     As described on page 6 of the Report under the heading *"Closing Statements – Day One 9/19/2013"*: *"Closing statements began at 17:30."*   Closing statements were *"completed at 17:42."*  (See, Exhibit "E".)

56.     The closing of the "hearing record" of any Step Two Grievance Hearing is defined in paragraph 3 of the required "Conduct of the Step Two Grievance Hearing" described in the UB GME GPP; "Recesses and Adjournments".  Paragraph 3 reads: *"Upon conclusion of the presentation of oral and written information, the Grievance Hearing record is closed."*  (See, Exhibit "B".)

57.    In that same section, the UB GME GPP clearly describes the Step Two Committee's obligation to conduct deliberations upon just the closed grievance hearing record.

58.    As described on page 6 of the Report under *"Grievance Hearing Committee Deliberations - Day One 9/19/2013"*:  *"The Committee then met, after excusing the parties, and discussed the evidence, both written and oral, in detail."*

59.    After closing the hearing record at 5:42 pm, the Step Two Committee conducted deliberations for approximately one hour until 6:50pm *"(18:50)"*.

60.    As a matter of fact, the Step Two Grievance Committee (after conducting deliberations upon the closed September 19, 2013 hearing record) made the following determinations:  *'uncertainty…with the issue of credentialing, and the veracity, relevance and timeliness of the patient incidents'… on the part of the 'Program' and its '…versions and rationalization' and 'skepticism about….the Program, during this transition, both in terms of change in the program director and the credentialing issue.'* (Emphasis added.)

61.    These determinations readily confirm, Defendants through and including, Cherr had not been able to "meet the criteria for [termination]" - - the very first question the Committee was charged with answering.

62.    After conducting deliberations for approximately one hour until 6:50pm *"(18:50)"*, not a single Step Two Grievance Committee member was able to uphold CHERR's dismissal action based upon the evidence which he presented at the Step Two Grievance Hearing on September 19, 2013.

63.    Instead, the Committee, after the record had been closed, then reported, *"The Committee, after lengthy discussion, unanimously decided additional information was required."* (Exhibit "E".)

      **(iii)**     **Defendants' Post-hearing Conduct Rendered the entire Grievance Process Meaningless**

64.    In order to sustain the Dismissal action, CHERR had to prove that:*"...the decision to terminate Dr. Barsoumian for failing to meet the criteria for removal from probation [was] supported by the evidence contained in the file and testimony of witnesses (both written and oral)."*

65.    After being afforded an approximately 4½ hour Step Two Grievance Hearing to prove his case for termination, presenting to the Committee a 211 page written submission and vigorously arguing his case, CHERR failed to prove his case -- that Dr. Barsoumian's dismissal was supported by the evidence presented.

66.    One day after the Step Two Grievance Hearing ended, Dr. Barsoumian received an email from ORRANGE in which she wrote:

> Pursuant to the Grievance Policy and Procedure, the Step Two Grievance Hearing Committee has decided to reconvene the Step Two Grievance Hearing to obtain additional information to assist in making its determination.   The Grievance Hearing Committee has requested that Ms. Ruth Nawotniak & Dr. Michael Chopko appear and provide testimony….The Step Two Grievance Hearing will be reconvened on Thursday, September 26, 2013 at 12 noon.

(A copy of ORRANGE'S email is attached as Exhibit "G".)

67.    Dr. Barsoumian immediately responded to ORRANGE'S email and objected to the actions contemplated by the Committee. Dr. Barsoumian wrote:

> *"The grievance committee did not <u>recess</u> the hearing to reconvene at a later date.   Rather, both Dr. Cherr and I made our closing statements and the grievance hearing ended at 5:45pm. Accordingly, as described on page 4 of UB's Grievance Policy and Procedure, the Grievance Hearing record is now closed:' Upon conclusion of the presentation of oral and written information, the Grievance Hearing record is **closed**. 'Contrary to your assertion, the Policy does not provide for **reopening** a Grievance Hearing Record that is closed.   The Policy does not provide for reopening a Grievance Hearing Record that has*

*been **closed, especially for the purpose of furthering either party's position by calling witnesses that they otherwise had been given an opportunity to call.** It is certainly, for these very reasons, that a closed Grievance Hearing Record cannot be reopened."*

(A copy of Dr. Barsoumian's email is attached as Exhibit "H".)

68.     The right to call and examine witnesses is a right which UB GME GPP affords exclusively to the parties (resident and program director) and is described in paragraph 1 of "Conduct of the Step Two Grievance Hearing": "Attendance".

69.     In paragraph 1 "Attendance", the UB GME GPP's required "Conduct of the Step Two Grievance Hearing" states:

> "Each party has the right to call and examine witnesses and cross-examine any witness, including representatives from the program. Witness lists must be submitted no later than five (5) working days before the Grievance Hearing."

70.     In order for a party to exercise his right to call and examine witnesses at a Step Two Grievance Hearing, a party must identify the individual(s) who he intends to call as a witness at the hearing on a 'witness list.'  In addition, "Witness lists must be submitted no later than five (5) working days before the Grievance Hearing."

71.     The UB GME GPP only permits a party to produce witness testimony at a Step Two Grievance Hearing in support of his or her position when the party had previously identified the witness(es) on a witness list and timely submitted the witness list by the predetermined deadline.

72.     "The right to call and examine witnesses" at a Step Two Grievance Hearing is a fundamental due process right and safeguard given to Dr. Barsoumian under his REA.

73.     "The right to call and examine witnesses" is a fundamental due process right and safeguard given under the US Constitution.

74.     The evidence available for review by a Step Two Grievance Hearing Committee is predetermined by the parties and includes: written statements, documents and the identification of witness(es), who may be called by a party to offer testimony at a Step Two Grievance Hearing.

75.     The UB GME GPP (authorizes the Committee Chairman to determine the order of testimony at the hearing, determine if information may be presented by a party, remove disruptive individuals and setting time limits on testimony.)

76.     The UB GME GPP does not permit anyone, including the Chairman, to call witnesses who had not previously been timely identified by either party.

77.     UB GME GPP excludes anyone, other than those witnesses who had been timely identified by the parties, from attending a Step Two Grievance Hearing, appearing before the Step Two Grievance Committee and offering witness testimony.

78.     The UB GME GPP does not permit anyone other than the parties, to identify or invite individuals to offer witness testimony at the Step Two Grievance Hearing.

79.     ORRANGE ignored Dr. Barsoumian's September 20, 2013 email.  (See, Exhibit "H").

80.     Accordingly on September 23, 2013, Dr. Barsoumian's attorney sent a letter to UB GME Associate Counsel (WILLIAMS), UMRS' Counsel (Earl Cantwell) and Assistant Attorney General of New York (David Sleight) objecting to the unlawful conduct, and instructing them follow the UB GME GPP.  Dr. Barsoumian's attorney advised:

> *"None of these actions is authorized under the University's Grievance policies and procedures.  First, once a record is closed, the Committee only has authority to deliberate and issue a decision on the record before it.  Second, the Committee lacks all authority and discretion to call witnesses.  The Committee is a neutral, unbiased factfinder, not a fact presenter or argument maker. Indeed, it is perfectly obvious that the Committee both recognizes the*

*University's deficiencies in proof and that the Committee is attempting to remediate same by putting on the University's case for it. The Committee's actions in this regard are wholly improper and a total abuse of discretion."*

*"UB's Grievance Policy and Procedure, under the heading, "Conduct of the Step Two Grievance Hearing," provides that: "Decisions are determined by a majority of members of the Grievance Hearing Committee. In the event a majority is unable to render a decision, a second Step Two Grievance Hearing Committee must be convened by the GME director or designee within 20 days."*

*"For sure, neither one of these witnesses are being requested to further Dr. Barsoumian's position. Indeed, if Dr. Barsoumian had chosen to call either of these witnesses, he would have included them on his witness list. One would presume that the University would similarly have identified these witnesses and presented them at the hearing, but they did not. Indeed, the University's opportunity to call witnesses was forever lost as of 5 p.m. on September 12th. Dr. Barsoumian vigorously objects to either of these witnesses being called inasmuch as the record is closed; the University waived its right to present these witnesses; and the Committee lacks all power to call its own witnesses."*

(A copy of Dr. Barsoumian's attorney's letter is attached as Exhibit "I".)

81.     Upon receipt of that letter, WILLIAMS and UMRS were advised and knew they were obligated to proceed in accordance with the UB GME GPP which clearly describes the procedure and process required in the event that a majority of the Step Two Grievance Committee members remain unable to render decisions to the questions which they have been charged to answer pursuant to conducting deliberations upon a closed Step Two Grievance Hearing record.

82.     WILLIAMS and UMRS chose to disregard the UB GME GPP.

83.      On September 24, 2013, ORRANGE advised Dr. Barsoumian:

*"[t]he Chair of the Step Two Grievance Hearing Committee has exercised his discretion to "recess and reconvene, without additional notice, provided the hearing is reconvened in the presence of both parties and their respective representatives", for the purpose of obtaining additional testimony....Dr. Gibbons has reconvened the Step Two Grievance Hearing to hear testimony from Ms. Ruth Nawotniak, Program Administration, General Surgery Residency Program, and Dr. Michael Chopko, Assistant Professor of Surgery.... Please respond and confirm that you will attend."*

(A copy of ORRANGE's email is attached as Exhibit "J".)

84.     On September 25, 2013, Dr. Barsoumian responded to ORRANGE'S email and reasserted his objection as follows:

> *"I will attend the meeting on Thursday.  However, under no circumstance should my attendance or participation in the meeting be misconstrued by anyone that I have made any sort of concession that a Grievance Hearing Record that was closed on September 19, 2013 could be reopened at any time (including September 26th).  Again, I assert my objection to the reopening of this closed Grievance Hearing Record. In addition, I ask that you inform the Grievance Committee Chairman to note my objection in the written decision of the Grievance Committee which UB Policy requires him to author."*

(A copy of Dr. Barsoumian's email is attached as Exhibit "K".)

85.     Although the UB GME GPP does provide that the Step Two Grievance Chairman may recess and reconvene the <u>hearing</u>, the <u>hearing</u> ended at 5:42pm on September 19, 2013. Therefore, after 5:42pm on September 19, 2013, there was no hearing that could be recessed and reconvened -- the Step Two Grievance Hearing had ended.

>   **(iv)    Defendants conducted a sham Step Two Grievance Hearing on September 26, 2013 in violation of the UB GME GPP, Dr. Barsoumian's due process rights and the terms of his REA**

86.     At 12:00pm on September 26, 2013, GIBBONS reconvened the hearing which had ended the week before.

87.     As memorialized on page 7 of the Report, Dr. Barsoumian objected to the convening of an additional hearing, obtaining additional information and calling of witnesses;

*"Ms. Orrange stated that the Resident had a prepared statement protesting the reconvening of the Hearing.  The protest was read by the Resident, and noted by the Chair."*  (See, Exhibit "E".)

88.     GIBBONS proceeded to call his witnesses Dr. Michael Chopko and Ms. Ruth Nawotniak to offer after-the-fact, post-hearing testimony on September 26, 2013.

89.     Pursuant to GIBBONS calling his own witnesses and convening his own hearing on September 26, 2013, the Committee ignored the evidence before it and rendered irrational and arbitrary findings upon which it upheld CHERR's termination action.  The Committee's malicious motivation became clear pursuant to its rulings on September 26, 2013.

> **(v)     Step Three Appeal could not and did not countenance Defendants rendering the entire grievance process meaningless on and after September 24, 2013**

90.     On January 28, 2014, a Step Three Appeal Committee was convened to review the Conduct of the Step Two Grievance Committee.

91.     The Step Three Appeal Committee was charged to answer a single question: *"Were there limitations on, or violations of, applicable due process in the conduct of Dr. Barsoumian's Step Two Grievance Hearing, in violation of the UB GME Grievance Policy and Procedure (2012)?"*

(A copy of the instructions to the Step Three Appeal Committee is attached as Exhibit "L".)

92.      The Step Three Appeal Committee was not charged to answer either of the two questions which the Step Two Committee had been charged to answer.

93.     The Step Three Appeal Committee had not been charged to review, nor did it review, the propriety of CHERR'S dismissal action.

94.     As a matter of fact, the Step Three Appeal Committee was specifically barred from addressing the appropriateness of the determination made by the Step Two Grievance Hearing Committee as follows:

"This Step Three Appeal will not address the appropriateness of the determination made by the Step Two Grievance Hearing Committee."

(See, Exhibit "M" – Justification for and scope of Appellate Review for Step Three Committee.)

95.     The Step Three Appeal Committee did not find that Dr. Barsoumian's right to due process was violated, and the Committee upheld the determination of the flawed Step Two Hearing.

96.     Dr. Barsoumian was notified of the Step Three Appeal Committee's decision on February 27, 2014.

**II.     PLAINTIFF WAS DEPRIVED OF AND CONTINUES TO BE DEPRIVED OF HIS PROPERTY RIGHT IN HIS PGY3 CATEGORICAL RESIDENCY POSITION AND THE EQUITABLE RELIEF ORDERED BY THIS COURT**

97.     Defendants never intended to reinstate Dr. Barsoumian to one of the nine permanent categorical residency slots in the PGY3 class which the ACGME alots the residency program on a yearly basis and which Dr. Barsoumian had previously occupied.

98.     Upon information and belief, at the time of the time of this Court's March, 2012 Decision and Order, Defendants had two available permanent categorical PGY3 residency slots beginning in the 2012-2013 academic year.

99.     Nevertheless, in a statement to this Court, BERGER duplicitously suggested that the UB General Surgery Residency program did not have enough categorical residency slots at the PGY3 level to accommodate Dr. Barsoumian's reinstatement and training at the PGY3 level beginning in the 2012-2013 academic year through 2015, absent the ACGME authorizing an additional categorical residency slot:  *"The most substantial issue that has had to be addressed is securing authorization from the Accreditation Council for Graduate Medical Education ("ACGME") to train another surgical resident."*

100.     Upon information and belief, Defendants hired two additional physicians who had not previously been affiliated with the program to fill the two vacant PGY3 categorical residency slots in the PGY3 class beginning in the 2012-2013 academic year.

101.     On May 11, 2012, BERGER sent Dr. Barsoumian an email informing him that the UB General Surgery Residency program had been "granted a temporary increase in the resident complement by ACGME."

(A copy of BERGER'S email is attached as Exhibit "N".)

102.     Upon information and belief, the temporary residency slot which Defendants reinstated Dr. Barsoumian to on June 4, 2012 expired on or about July 1, 2012.

103.     Defendants failed to provide Dr. Barsoumian with residency training authorized by the ACGME beyond the expiration of the finite term of the temporary residency slot which, upon information and belief, expired on or about July 1, 2012 – approximately 26 days after Dr. Barsoumian signed his REA.

104.     Defendants induced Dr. Barsoumian to sign an REA in 2012 by making material misrepresentations in the June 4, 2012 REA which misled Dr. Barsoumian to believe that the 'temporary' slot which they had received from the ACGME could accommodate the promises made in the REA as it pertained to the duration of the 'term' of employment and the availability of "Renewal Year(s)".

105.     Dr. Barsoumian continued to work under the REA upon the belief that his PGY3 position was effectively the same as the PGY3 position that he had previously occupied prior to his unlawful removal from the program.

106.     Upon information and belief, at the time of the Court's March, 2012 Decision and Order, the UB General Surgery Residency program was eligible to request from the

ACGME/RRC a permanent increase in the categorical resident complement at the PGY3 level to ten permanent categorical residency slots.

107.    Upon information and belief, Defendants never made an application to the ACGME for a permanent increase which would have accommodated Dr. Barsoumian's training as a PGY3 resident beginning in the 2012-2013 academic year until his anticipated completion of the training program in 2015.

108.    Defendants deprived Dr. Barsoumian of his constitutionally protected property right to one of the nine permanent categorical residency slots at the PGY3 level in UB's General Surgery Residency Program without providing him proper notice or a meaningful opportunity to be heard.

109.    Dr. Barsoumian suffered financial injury, was subsequently deprived of the clinical training to which he was entitled and suffered an unwarranted dismissal action as a result of Defendants' reinstatement of him into a temporary residency slot.


III.    **DR. BARSOUMIAN'S ACCESS TO KALEIDA HEALTH SYSTEM FACILITIES REMAIN SUSPENDED DUE TO DEFENDANTS' UNLAWFUL CONDUCT**

(i)    **Background of Kaleida Health 2005 Harassment Allegation and the Kaleida Health System's 'investigation'**

110.    In March of 2012, this Court rejected Defendants' duplicitous claim that Dr. Barsoumian failed to pursue or somehow abandoned his grievance rights pertaining to an alleged 2005 harassment matter at the Kaleida Health System.

111.    The Court rejected Defendants' claim that Dr. Barsoumian failed to exhaust his administrative remedies or abandoned the grievance process with regard to either the remedial

action taken by the University on July 14, 2005 (counseling session) or the action taken by the Kaleida Health System on February 20, 2006 (suspension).  As memorialized on page 12 of this Court's March, 2012 decision (Docket No. 107):

*"...the grievance process has not yet concluded with respect to Kaleida Health's determination that Dr. Barsoumian violated the sexual harassment policy..."*

112.    In spite of the Court's findings, Defendants continued to disregard Dr. Barsoumian's grievance rights upon his return in 2012 pertaining to the harassment matter.

113.    In a 2012 statement to this Court, BERGER swore:

*"As previously mentioned, some of UB's affiliated hospitals have refused to allow Dr. Barsoumian to train at their facilities.  For example, as the Court is aware, Kaleida Health will not allow Dr. Barsoumian to train in any of its facilities based on a 2005 finding that Dr. Barsoumian violated its policy regarding workplace harassment (a finding that Dr. Barsoumian never challenged)."*

(Emphasis added.)

114.    But, as this Court subsequently found, Defendants had never given Dr. Barsoumian proper notice in 2006 (a Level I discussion) informing him that the Kaleida Health System had suspended him from their facilities prior to Defendants terminating him.

115.    Following the March 2012 Decision and Order, the Kaleida Health System nonetheless continued suspending Dr. Barsoumian's access to their facilities with Defendants going along with same, despite their knowledge of this Court's determination.

116.    On May 21, 2012, Dr. Barsoumian sent BERGER a letter advising her that he had never abandoned his Level II Grievance pertaining to the Kaleida Health harassment matter and that UB did not reschedule the Level II Grievance Hearing which it had promised, but failed to reschedule, as it pertained to the *University's* action taken by BERGR on took in July 14, 2005 –

the corrective measure of a "counseling session."  Dr. Barsoumian requested that BERGER

schedule a Level II Grievance Hearing pertaining to the harassment matter.

(A copy of Dr. Barsoumian's letter is attached as Exhibit "O".)

117.    Ms. Carrie Eckart was, in 2012, the UB employee who was responsible for

scheduling grievance hearings.

118.    Dr. Barsoumian requested Ms. Eckart to inform him who were selected to serve

on the Level 2 Grievance Hearing Committee and the proposed date of the Level II Grievance

Hearing.

(A copy of Dr. Barsoumian's email is attached as Exhibit "P".)

119.    On June 15, 2012, Dr. Barsoumian demanded that the Level II Grievance Hearing

pertaining to the 2005 harassment matter be scheduled and demanded he be informed of the time,

date and place where the Level II Grievance would be held.  Dr. Barsoumian wrote:

> *"If you have not yet confirmed who will serve on the grievance committee or*
> *have not yet determined the date, time and place where it will be held, I politely*
> *ask you to do so immediately and without further delay.  I have been trying*
> *desperately to grieve this matter for over 6 1/2 years.  I require 7 days advance*
> *notice because I am in the process of preparing a submission for the grievance*
> *committee.  The submission must be received by the Office of Graduate Medical*
> *Education within 5 days of the grievance according to the University's*
> *grievance procedures policy."*

(A copy of Dr. Barsoumian's email is attached as Exhibit "Q".)

120.    In spite of this Court's finding that Dr. Barsoumian's [g]rievance process has not

yet concluded with respect to Kaleida Health's determination that Dr. Barsoumian violated the

sexual harassment policy", BERGER maliciously denied Dr. Barsoumian's request for a Level II

Grievance Hearing pertaining to the 2005 harassment matter:

> *"This is in response to your June 15th email to Ms. Carrie Eckart. The request*
> *to convene a Level II grievance committee pertaining to the sexual harassment*

*matter of May, 2005, is denied on the grounds of undue delay and abandonment."*

(A copy of BERGER'S letter is attached as Exhibit "R".)

121.    Defendants have continued to injure and defile Dr. Barsoumian since this Court ordered that Dr. Barsoumian be reinstated.

122.    Defendants' barring Dr. Barsoumian's grievance rights pertaining to this 2005 harassment matter has, to date, some 9 years later, precluded Dr. Barsoumian from challenging the University's corrective measure of a counseling session which has, among other things, continued to severely damage Dr. Barsoumian's professional reputation and has interfered with his ability to obtain employment in graduate medical education residency training.

123.    Similarly, Defendants' barring Dr. Barsoumian's grievance rights pertaining to this 2005 harassment matter has precluded Dr. Barsoumian from challenging Kaleida's suspension action which has, among other things, continued to severely damage Dr. Barsoumian's professional reputation and has interfered with his ability to obtain employment in graduate medical education residency training.

## FIRST CAUSE OF ACTION AS AGAINST UMRS

## BREACH OF CONTRACT

124**.**    Dr. Barsoumian repeats and reproduces the allegations contained in paragraph numbered 1 to 123, inclusive, as though fully set forth herein.

125.    UMRS and Dr. Barsoumian entered into the REA on or about 4 June 2012.

126.    Dr. Barsoumian was acting under, or otherwise performing under the REA.

127.    The actual and/or implied terms of said contract included UMRS' obligation to fully respect Dr. Barsoumian's due process rights and followed established UNIVERSITY policies, upon which Plaintiff relied to his detriment.

128.    UMRS breached Dr. Barsoumian's Employment Agreement by: (1) refusing to reinstate him to one of the nine categorical residency slots which he had previously occupied prior to his unlawful removal from the residency program, (2) dismissing him from the residency program in 2012 in violation of the University's Academic Action Policy and Procedure, (3) refusing to follow the UB GME GPP as it pertained to the termination of Dr. Barsoumian's employment relationship which UMRS terminated by deviating from the said Policy, (4) unjustly depriving Dr. Barsoumian the opportunity to grieve the University's corrective action (counseling session) as it pertained to the 2005 Kaleida Health harassment matter, (5) unjustly depriving Dr. Barsoumian proper notice and the opportunity to grieve the suspension action which the Kaleida Health System enforced in 2012, (6) unjustly barring Dr. Barsoumian's grievance rights pertaining to the court-ordered probation and (7) failing to provide Dr. Barsoumian with an educational environment conducive to learning and successful progress in the residency program. In addition, UMRS failed to secure authorization to train Dr. Barsoumian beyond June 30, 2012 and was in material breach of Dr. Barsoumian's REA as of on or about July 1, 2012.

129.    As a result of Defendant UMRS' breach of his REA, Dr. Barsoumian has been damaged in an amount to be determined after trial; Dr. Barsoumian though here seeks specific performance of his Employment Agreement by UMRS, including most specifically full reinstatement to one of the nine PGY3 categorical residency slots which the ACGME alots the

residency program on a yearly basis – any financial remedy is secondary to his claim for specific performance.

## SECOND CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH CONTRACT AS AGAINST WILLIAMS, HASSETT, BERGER, CHERR, ORRANGE and GIBBONS

130**.**    Dr. Barsoumian repeats and reproduces the allegations contained in paragraph numbered 1 through 129, inclusive, as though fully set forth herein.

131.    WILLIAMS, HASSETT, BERGER, CHERR, ORRANGE and GIBBONS, jointly and severally knew that Dr. Barsoumian had an REA with UMRS.

132.    Defendants BERGER, ORRANGE and WILLIAMS were at all times responsible for overseeing and supervising the Conduct of the Step Two Grievance Hearing and the entire Step Two Grievance Hearing process and procedure.

133.    Defendants WILLIAMS, BERGER, ORRANGE, CHERR and GIBBONS jointly and severally, schemed and acted in a manner to deprive Dr. Barsoumian of the benefits and protections under the REA.

134.    Defendants WILLIAMS, BERGER, ORRANGE, CHERR and GIBBONS jointly and severally, schemed and acted in a manner to deprive Dr. Barsoumian of his due process rights.

135.    Defendant BERGER was at all times responsible for supervising Defendants ORRANGE who she selected as her designee to oversee and supervise the Conduct of the Step Two Grievance Hearing and the entire Step Two Grievance Hearing process and procedure.

136.    Defendants WILLIAMS, BERGER, ORRANGE, CHERR and GIBBONS knew or should have known the requirements of the UB GME GPP.

137.    Defendant BERGER had full knowledge of Defendant GIBBONS' proposed conduct and of Defendant ORRANGE'S actions and inactions described in her September 20, 2013 and September 24, 2013 emails to Dr. Barsoumian.

138.    Defendant BERGER intentionally and maliciously chose not to remedy the wrong after learning of it.

139.    Defendant BERGER intentionally chose not to inform her subordinates (Defendant ORRANGE and defendant GIBBONS), that their intended conduct was impermissible under the UB GME GPP and under the REA.

140.    Defendant BERGER, who previously was found to have violated Dr. Barsoumian's right to procedural due process, had full knowledge of this Court's March 2012 ruling and was aware of the due process which must be afforded to a UB resident in jeopardy of a termination action.

141.    Defendant WILLIAMS has certain supervisory responsibilities over all UB officials in the SUNY at Buffalo Graduate Medical Education Consortium, including but not limited to Defendants BERGER, HASSETT, ORRANGE, CHERR and GIBBONS.

142.    Defendant WILLIAMS had full knowledge of this Court's rulings as they pertained to Dr. Barsoumian's prior lawsuit against Defendants.

143.    Defendant WILLIAMS had full knowledge of Dr. Barsoumian's REA and also of the UB GME GPP.

144.    After receiving Dr. Barsoumian's counsel's letter on September 23, 2013, Defendant WILLIAMS had full knowledge of the other defendants' actions and inactions, but nevertheless intentionally chose not to take any action to ensure that Dr. Barsoumian's contract rights were protected.

145.    Defendant WILLIAMS intentionally and maliciously chose not to direct the other defendants to follow the terms of the REA and the UB GMA GPP.

146.    Defendant WILLIAMS intentionally and maliciously failed to prevent the other defendants from engaging in the impermissible actions in violation of the "Conduct of the the Step Two Grievance Hearing" as described in the UB GME GPP including, but not limited to, reconvening of a closed hearing.

147.    Pursuant to learning that the Step Two Grievance Hearing Committee remained unable to render a majority decision after conducting deliberations upon the September 19, 2013 hearing record, Defendants WILLIAMS, BERGER, ORRANGE and/or GIBBONS deprived Dr. Barsoumian of the full procedural protection of convening a second Step Two Grievance Hearing Committee for a de novo review of Defendant CHERR'S termination action, and instead permitted a complete and unfair reopening of the closed record, thereby rendering the entire grievance process meaningless.

148.    Defendants WILLIAMS, BERGER, ORRANGE, CHERR and GIBBONS intentionally interfered with Dr. Barsoumian's contractual rights between him and UMRS by terminating Dr. Barsoumian without following and/or deviating from the UB GME GPP.

149.    Defendants maliciously deprived Dr. Barsoumian of his grievance rights pertaining to the court-ordered probation.

150.    Defendants maliciously placed Dr. Barsoumian on probation in 2012 for matters that had been previously addressed and remediated.

151.    CHERR dismissed Dr. Barsoumian in violation of the UB GME Academic Action Policy and Procedure (2010).

152.    As a result of said interference, Dr. Barsoumian has been damage in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**AS AGAINST ALL DEFENDANTS**
**DEPRIVATION OF CIVIL RIGHTS UNDER 42 USC § 1983**

153.    Dr. Barsoumian repeats and reproduces the allegations contained in paragraph numbered 1 through 152, inclusive, as though fully set forth herein.

154.    In the year 2005, when Dr. Barsoumian started in the residency program at the University of Buffalo he had an expectation that he would complete his residency at the University.  Dr. Barsoumian relied upon Defendants proceeding in accordance with the University's policies as it pertained to Dr. Barsoumian participation and continuation in the residency program.  In fact, the residency program's and University's policies, materials and literature affirm that as long as the resident fulfills her or his obligations, the resident will have the continued opportunity to complete her or his education.

155.    Dr. Barsoumian also knew, from the terms of his earlier REA, that he could only be terminated from the program in accordance with the UB GME GPP.

156.     Dr. Barsoumian was, however, wrongfully removed from his position and that wrongful removal was the basis for a successful lawsuit.  The Court ordered that Dr. Barsoumian be reinstated.

157.      Dr. Barsoumian had a property right to one of the nine permanent categorical residency slots which the ACGME alots to the program on a yearly basis and to which Dr. Barsoumian was appointed to upon his matriculation into the residency program in 2002 and to which he was appointed to for successive PGY2 and PGY3 renewal terms.

158.     Dr. Barsoumian had a property right to his permanent PGY3 Categorical Residency slot.

159.     Dr. Barsoumian could only be removed from his residency position in accordance with the procedures and processes under the UB GME GPP.

160.   Dr. Barsoumian possesses a constitutionally protected property right not to be terminated from the residency program without a due process hearing in accordance with terms of his REA.

161.     The UB GME GPP specifically provides that any termination of employment is subject to the UB GME Grievance Procedures Policy.

162.     The defendants intentionally chose not to abide by the UB GME GPP thereby depriving Dr. Barsoumian a meaningful hearing and opportunity to challenge CHERR'S dismissal action.

163.     The Defendants arbitrarily, deliberately and maliciously deprived Dr. Barsoumian of his constitutionally protected property right not to be terminated without a Step Two

Grievance Hearing in accordance with terms of the UB GME GPP which are incorporated by direct reference into his REA.

164.    Defendants through their actions and inactions demonstrated a malicious and sadistic abuse of governmental authority intended to oppress Dr. Barsoumian's constitutional right to both procedural and substantive due process and to cause him injury despite the fact that there was no legitimate governmental purpose to do so, but instead an expressly stated requirement that Defendants abide by their policies, including but not limited to, the UB GME Academic Action Policy and Procedure (2010) and the UB GME Grievance Policy and Procedure (2012).

165.    Defendant WILLIAMS failed to supervise and train BERGER and HASSETT to conduct themselves in accordance with the University's Policies and due process which Dr. Barsoumian was entitled to receive, including but not limited to, that which is described in his REA, the UB GME Academic Action Policy and Procedure (2010), the UB GME Grievance Policy and Procedure (2012), the University's Affiliation Agreements with the Kaleida Health System and the University's Unlawful Harassment Policy.

166.    Defendant WILLIAMS  failed to supervise and train BERGER and HASSETT to observe Dr. Barsoumian's due process rights and contractual rights despite the fact that both HASSETT and BERGER had previously been found to have violated Dr. Barsoumian's right to due process.

167.    Defendant WILLIAMS failed to supervise and train CHERR, ORRANGE and GIBBONS to conduct themselves in accordance with the University's Policies and due process which Dr. Barsoumian was entitled to receive, including but not limited to, that which is

described in his REA, the UB GME Academic Action Policy and Procedure (2010) and the UB GME Grievance Policy and Procedure (2012).

168.    Defendants deprived Dr. Barsoumian of the full procedural protection of his grievance rights described in the UB GME GPP and as it pertained to the court-ordered probation action.

169.    The actions of the defendants, joint and severally, have deprived Dr. Barsoumian of his civil rights under 42 USC 1983.

170.    As a result of this violation of his Constitutional rights, Dr. Barsoumian has been damaged in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION – FRAUD**

**AS AGAINST DEFENDANTS WILLIAMS, BERGER, HASSETT and UMRS**

171**.**    Dr. Barsoumian repeats and reproduces the allegations contained in paragraphs numbered 1 through 170, inclusive, as though fully set forth herein.

172.    Dr. Barsoumian relied upon the promises Defendants made in the June 4, 2012 REA.

173.    Dr. Barsoumian relied upon the Defendants fraudulent misrepresentation that approval for an additional residency position had to be obtained from ACGME to accommodate his reinstatement.

174.    Dr. Barsoumian relied upon the Defendants fraudulent misrepresentation that the temporary residency position which Defendants had obtained and to which they reinstated Dr.

Barsoumian was identical to the permanent categorical residency position from which he had been unlawfully removed.

175.    Through the language of the June 4, 2012 REA, Dr. Barsoumian was led to believe and relied upon the misrepresentation that the increase in the resident complement described by BERGER in her May 11, 2012 email confirmed that the ACGME/RRC had granted the UB General Surgery Residency Program the type of increase which BERGER described in her April 18th letter; 'beginning this academic year through 2015.', i.e., in essence, a tenth categorical residency slot which would accommodate his residency training through its anticipated completion.

176.    Dr. Barsoumian relied upon the Defendants' fraudulent misrepresentation that the temporary residency position which he was reinstated could accommodate a full contract year of training and/or successive renewal years as reflected in the June 4, 2012 REA.

177.    Dr. Barsoumian was induced to endorse the June 4, 2012 REA due to Defendants' fraudulent misrepresentations.

178.    Dr. Barsoumian relied upon Defendants' fraudulent misrepresentations to his detriment.

179.    Defendants misled Dr. Barsoumian to believe that the ACGME  authorized his training beyond the expiration of the finite term of the 'temporary' slot to which he was reinstated.

180.    Defendants misled Dr. Barsoumian to believe that his ability to receive training authorized by the ACGME beyond the expiration of the finite term of the temporary slot and/or

the renewability of his REA beyond the "Contract Year" was wholly based upon his satisfactory performance in the program.

181.     Defendants misled Dr. Barsoumian to believe that Defendant HASSETT maintained the required qualifications (such as current board certification) to continue serving as his program director on or after July 2, 2012.

182.     Defendants gained an unfair advantage upon Dr. Barsoumian by depriving him of the equitable relief which he was awarded by perpetrating a fraud upon him.

183.     Defendants gained an unfair advantage upon Dr. Barsoumian by reinstating him to a position materially different from one of the nine permanent categorical residency slots at the PGY3 level which the ACGME alots the residency program on a yearly basis.

184.     Defendants had full knowledge that the residency program possessed two vacant categorical positions in the PGY3 class beginning in the 2012-2013 academic year, either of which would have accommodated Dr. Barsoumian's reinstatement.

185.     Defendants had full knowledge that they did not have to seek authorization from the ACGME for an additional residency position to accommodate Dr. Barsoumian's reinstatement or their required compliance with the Court's March 2012 order.

186.     Defendants obtained monies from the Federal government which it could not have otherwise obtained had Defendants not induced Dr. Barsoumian through fraudulent means to endorse the June 4, 2012 REA.

187.     Defendants would not have been able to induce Dr. Barsoumian and 9 other PGY3 categorical residents to endorse REA's for the 2012-2013 PGY3 academic year when Defendants had only been authorized to train nine residents.

188.     Plaintiff has suffered monetary damages due to the fraud by Defendants UMRS, WILLIAMS, BERGER and HASSETT.

## DEMAND FOR TRIAL BY JURY

Dr. Barsoumian demands a trial by jury on all causes of action set forth herein.

**WHEREFORE**, Dr. Barsoumian respectfully demands judgment as follows:

a.      For a permanent injunction directed at the Defendants, enjoining them from taking any further actions which infringe upon Dr. Barsoumian's constitutional and statutory rights;

b.      For a declaratory judgment that the actions of Defendants violated Dr. Barsoumian's rights under the United States Constitution and violated his Employment Agreement;

c.      For an order requiring Defendants to vacate the decision to terminate Dr. Barsoumian;

d.      For an order requiring Defendants to specifically perform their contractual obligations to Plaintiff , including reinstating Dr. Barsoumian to one of the nine permanent PGY3 categorical residency positions which the ACGME allots to the UB General Surgery Residency Program on a yearly basis;

e.      For general compensatory damages against the individual Defendants in an amount to be determined after trial;

f.      For exemplary or punitive damages against the individual Defendants in an amount to be determined after trial;

g.      For attorneys' fees pursuant to 42 U.S.C. § 1988;

h.      The costs and disbursements of this action and such other relief as this Court deems just and proper.

Dated: April 1, 2014
        Hamburg, New York

                                                Respectfully submitted,


                                                *s/Andrew P. Fleming*

                                                _____
                                                Andrew P. Fleming, Esq.
                                                Chiacchia & Fleming, LLP
                                                *Attorneys for Plaintiff*
                                                5113 South Park Avenue
                                                Hamburg, New York 14075
                                                Telephone: (716) 648-3030
                                                Facsimile: (716) 648-0810
                                                E-Mail: andy@cf-legal.com